# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-KA-01202-SCT

*ARDES JOHNSON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/25/2004 |
| TRIAL JUDGE: | HON. ALBERT B. SMITH, III |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | PHILLIP BROADHEAD |
| | RAYMOND L. WONG |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JOHN R. HENRY |
| DISTRICT ATTORNEY: | LAWRENCE Y. MELLEN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 08/11/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### EN BANC.

### SMITH, CHIEF JUSTICE, FOR THE COURT:

¶1. Ardes Johnson was indicted for deliberate design murder pursuant to Miss. Code Ann. § 97-3-19(1)(b). Following a jury trial in the Bolivar County Circuit Court, Johnson was found guilty and sentenced to serve a life term in the Mississippi Department of Corrections. Johnson's post-trial motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial was denied and this appeal followed.

¶2.     Finding that a pre-arming instruction (S-3) improperly precluded the jury's consideration of Johnson's theory of self-defense and that a defective self-defense instruction (S-4) is contradictory and confusing, we reverse and remand for a new trial.

## FACTS AND PROCEDURAL HISTORY

¶3.     Ardes Johnson was in Shelby, Mississippi, having made the trip from his home in Chicago to attend his grandmother's funeral. After the funeral, Johnson stayed in Shelby at his aunt's house and spent most of July 1, 2003, packing her belongings for an intended move. Shirley Landrum, an old friend of Johnson's whom he had not seen in twenty years, arrived at 10:00 a.m. to help Johnson pack his aunt's belongings. Throughout the day, Dennis Terrell Davis, Landrum's live-in boyfriend, stopped by the apartment to speak with Landrum.

¶4.     Davis made his first appearance at the apartment around 7:30 a.m., inquiring as to Landrum's whereabouts. Johnson informed Davis that Landrum was not there, and Davis left peacefully. Landrum arrived at the apartment to help Johnson pack around 10:00 a.m. Thirty minutes later, Davis returned to the apartment to speak with Landrum. Landrum and Davis went outside, had a conversation, and Davis went on his way. Landrum went back inside the apartment to continue helping Johnson pack.

¶5.     Johnson and Landrum continued packing throughout the day. While Johnson was packing, he found a folding knife, that had a blade around five inches long, among his aunt's belongings. According to Johnson, he is a knife collector, so he threw the knife into his suitcase to take with him when he left for Chicago. Around 9:30 p.m. Davis made his last visit at the apartment demanding to see Landrum. Davis, who was irate at the time, pounded on the front door demanding that Landrum leave the apartment. Upon Landrum's request, Johnson

2

informed Davis that Landrum was not at the apartment and had already left. Following this incident, Johnson called 911 and related the incident to Officer Gwendolyn Russell. Officer Russell arrived at the apartment for a short investigative visit and to look around for Davis. Officer Russell told Johnson that she did not see Davis and that if he came back to call the station.

¶6.     When Officer Russell left, Landrum and Johnson continued to pack and later took a break for dinner. Around midnight, the two decided to walk to the store to get a few beers. Johnson suggested walking instead of driving because it was a nice night outside. As Johnson was leaving the apartment, he put the folding knife in his pocket. While Landrum and Johnson were walking down the street, Johnson stopped at the corner to talk to a few friends. While they were on the street corner, Davis appeared from around a dark corner and ran towards Landrum calling her a liar and yelling obscenities. Davis approached Landrum hitting her in the chest with both hands and then hit her in the face. However, the number of times Davis actually struck Landrum is disputed. Upon seeing Davis hit Landrum, Johnson walked over to them and told Davis to stop hitting her. At this point, Landrum walked away from Davis, claiming that she did not want to get into a fight in the middle of the street. Both Johnson and Landrum testified that Davis had a black object in his hand, however, no object was ever recovered. Johnson claims that Davis then turned towards him, as if to hit him, and Johnson stabbed Davis once in the abdomen with the knife. When Landrum realized that Davis had been stabbed, she ran to a neighboring house to get a towel for the wound. Johnson threw the knife in some bushes and fled the scene.

¶7.     Marlon Taylor and his partner Curtis Smith,  paramedics at the Bolivar County Medical Center in Cleveland, Mississippi, responded to a 911 call supposedly placed by Johnson shortly after midnight.   When the paramedics arrived at the scene in Shelby, they saw the victim, Davis, lying on his back in the middle of the street.   At this point in time, Davis was not responding so they performed a sternum rub which proved successful in getting  him to respond.   The paramedics observed that Davis was suffering from a stab wound in the upper left region of his abdomen.   Davis was placed in the ambulance, where he continuously asked the paramedics if he was going to die.   Noticing that he was suffering from internal bleeding, the paramedics responded that they were doing everything they could to help him.   While in the ambulance, Davis was speaking to the police officer at the scene, Officer Russell, and told the officer that Ardes Johnson was the person that stabbed him.   Officer Russell went to Johnson's family home but was unsuccessful in finding Johnson.

¶8.     Around 6 a.m. Johnson left Shelby, Mississippi, and headed back home to Chicago. Johnson was eventually found on July 8, 2003, in Chicago by FBI Agent Pablo Araya.   Agent Araya is a special agent in the violent crimes task force and is also a fugitive coordinator for those that come into the Chicago area.   Agent Araya arrested Johnson in a home in the Chicago area, read him his *Miranda* rights, and then interviewed him at a police station.   Notes were taken contemporaneously with the interview, and a detective by the name of Robert Distasio was present during the interview.

¶9.     During the interview, Johnson gave his version of the story.   Johnson stated that he was in Shelby for his grandmother's funeral and stayed a couple more days to help his aunt move. Johnson told the agent that he found the folding knife while he was packing his aunt's

4

belongings and since he was a knife collector, he threw the knife into his suitcase. Johnson told the agent that it was a folding knife with a blade that was around five inches long. Johnson told Agent Araya that Landrum was helping him pack, that Davis repeatedly stopped by the house to speak with Landrum, and that Johnson eventually called the police after the third visit from Davis. Johnson also told Agent Araya that upon leaving the apartment to get beer, he placed the folding knife in his pocket for protection. Johnson then told Agent Araya that Davis hit Landrum and then turned towards him so he responded by stabbing him. Johnson also described the area where he threw the knife upon fleeing the scene.

¶10. When Charlie Griffith, a criminal investigator with the Bolivar County Sheriff's Department, received word from the FBI, he went and found the knife that was used to stab Davis. Upon Johnson's return to Mississippi, Griffith asked him if the knife he found in the bushes was the knife used to stab Davis, and Johnson replied that it was, in fact, the one he used to stab Davis.

¶11. Johnson was indicted on March 24, 2004, on a charge of murder and was tried by a jury in Bolivar County. Johnson continually asserted throughout trial that Davis made a gang sign towards him and he felt that his life was in danger. Johnson testified that the reason he grabbed the knife before leaving the apartment was to protect himself because Davis had earlier directed a gang sign towards him. However, it was never conclusively established whether Davis belonged to a gang. Johnson asserted that he stabbed Davis in self-defense and in defense of Landrum. However, the assertion that Davis made a threatening gang sign only came out during trial. The statement to the FBI in Chicago and to the police in Shelby did not contain the assertion that Davis threatened Johnson with a gang sign. Johnson was the only

witness to this claim, and Johnson was also the only witness to the stabbing of Davis because Landrum had already walked away.

¶12.    Following the trial, the jury returned a verdict of guilty, and the trial judge sentenced Johnson to serve a term of life imprisonment in the custody of the Mississippi Department of Corrections.    Subsequently, Johnson filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.  These motions were denied by the trial judge, and Johnson now appeals to this Court raising the following issues:

> 1.    **Whether the Trial Court Erred in Granting Jury Instructions S-3 and S-4.**
> 2.    **Whether the Trial Court Erred in Admitting into Evidence a Hearsay Statement under the Dying Declaration Exception.**
> 3.    **Whether the Trial Court Erred in Denying the Motion for a New Trial Because the Jury's Verdict Was Not Supported by the Weight of the Evidence**.

## ANALYSIS

**1.    Jury Instructions**

*Instruction S-3*

¶13.    Johnson argues that the trial judge committed reversible error by giving jury instruction S-3 regarding pre-arming because it allowed the jury to discount his theory of self-defense. The instruction given to the jury in this case reads as follows:

> The Court instructs the jury that if a person provokes a difficulty, arming himself in advance and intending, if necessary, to use his weapon and overcome his adversary, he becomes the aggressor and deprives himself of the right of self-defense.
> If you believe from the evidence in this case beyond a reasonable doubt, that the defendant, Ardes Johnson, provoked a difficulty with Dennis Terrell Davis (sic) after having armed himself as the case may – with a knife in advance of going out of the house and intended, if necessary, to use such weapon and overcome

6

Dennis Terrell Davis, then you shall not justify or excuse the action of defendant in self-defense

¶14.    In addition to the pre-arming instruction, the jury received one murder instruction, three self-defense instructions, and one defense of others instruction.

¶15.    "A criminal defendant is entitled to present his defense to the finder of fact. This Court has condemned outright the granting of any instruction that precludes a defendant from asserting a claim of self-defense." *Keys v. State*, 635 So. 2d 845, 848 (Miss. 1984) (citations omitted). This type of pre-arming instructions has repeatedly been denounced by this Court. *Id.* at 849. "When there is a total lack of evidence, it is not proper for a court to give a pre-arming instruction." *Dew v. State*, 748 So. 2d 751, 754 (Miss. 1999) (citing *Hart v. State*, 637 So. 2d 1329 (Miss. 1994)). Furthermore, when there is ambiguity regrading who is the first aggressor, a pre-arming instruction is not appropriate. *Id.* (citing *Barnes v. State*, 457 So. 2d 1347, 1349-50 (Miss. 1984)). This Court has stated that

> instructions such as [these] place a higher burden on a defendant to assert a claim of self-defense than is required by our law. It allows certain parts of the evidence to be considered while omitting other parts advantageous to the defendant's case.

*Keys*, 635 So. 2d at 849. "Even if the great weight of evidence against [the defendant] supports a contrary view, [the defendant] is still entitled to present his defense to the jury unimpaired by instructions similar to [these,] which preclude his right to self-defense." *Id.*

¶16.    This Court has upheld the pre-arming instruction in only three cases. *See Hart v. State*, 637 So. 2d 1329 (Miss. 1994); *Hall v. State*, 420 So. 2d 1381 (Miss. 1982); *Reid v. State*, 301 So. 2d 561 (Miss. 1974). In *Hart*, the defendant, while in no physical danger, armed

7

himself with a 20 gauge shotgun after carefully deliberating over his choice of firearms. 637 So. 2d at 1337. Furthermore, the defendant loaded the shotgun, drove over to the victim's house where he honked his horn and drove by several times waiting for the victim to appear. *Id.* In *Hall*, the record was uncontradicted that the defendant left his employment, armed himself with a shotgun, went to the victim's house after having been warned by his wife that they had threatened to hurt him if he came to the house, and after his wife reported to him that they had cursed her and threatened her earlier during the evening. 420 So. 2d at 1385. In *Reid*, the defendant, upon seeing the victim's car parked near the trailer, deliberately armed himself and proceeded to the trailer. 301 So. 2d at 564.

¶17. Those rare instances where this Court has upheld the pre-arming instruction are distinguishable from the case sub judice. Here, there is no evidentiary basis for the pre-arming instruction. While Johnson did arm himself with the knife, he did not seek the victim out as in the above mentioned cases. Johnson took the folding knife and placed it in his pocket before walking to the store. Johnson and Landrum walked to the store for beer, and there was no evidence that Johnson sought out Davis in order to provoke a altercation. The State did not produce any evidence that Johnson placed the knife in his pocket *intending* to provoke an altercation with Davis. In fact, while Johnson and Landrum were walking to the store, it was Davis who sought them out and initiated the confrontation with Landrum. While they were walking, Davis appeared from a darkened corner and ran towards Landrum calling her a liar and yelling obscenities at her. Furthermore, both Johnson and Landrum testified that Davis hit Landrum and that he had a black unidentified object in his hand. Landrum further testified that Davis was bouncing around and swinging at them. After Davis had hit Landrum a couple of

8

times, Johnson approached Davis to tell him not to hit Landrum anymore. That is when, according to Johnson, that Davis turned towards him as if to hit him with the object that was in his hand.

¶18. As this Court stated in *Keys*, "even if the great weight of the evidence against [Johnson] supports a contrary view, [Johnson] is still entitled to present his defense to the jury unimpaired by instructions similar to [S-3] which preclude his right to self-defense." 635 So. 2d at 849. "It is fundamentally unfair to deny the jury an opportunity to consider the defendant's defense where, as here, there is testimony to support his theory of self-defense." *Id.*

¶19. This is a case containing disputed facts regarding Johnson's self-defense, and this issue, according to *Keys*, 635 So. 2d 845, should be presented to the jury by conventional self-defense instructions. In *Keys*, the jury was given several self-defense instructions along with the pre-arming instruction. *Id.* at 848-49. This Court concluded that the pre-arming instruction cut off the jury's consideration of self-defense. *Id.* at 849. Furthermore, this Court has stated numerous times that "when the State seeks this instruction, it does so at its own peril." *Dew*, 748 So. 2d at 754 (citing *Hart*, 637 So. 2d at 1338). As was the case in *Keys*, S-3 was inappropriate under the facts of the case because it cut off the jury's consideration of self-defense. Thus, the granting of instruction S-3 was reversible error, and this case must be reversed and remanded for a new trial.

*Instruction S-4*

¶20. Johnson also argues that jury instruction S-4 misstated the applicable law, confused the jury, and negated his theory of the case when the instructions are considered in their totality. In reviewing a challenge to jury instructions, the instructions actually given must be read as a whole. *Williams v. State*, 863 So. 2d 63, 65 (Miss. 2004). When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found. *Id.* Instruction S-4 reads as follows:

> A person may not use more force than reasonably necessary to save his life, or the life of another, or protect himself or another from great bodily harm. When a person repels an assault with a deadly weapon, *he acts at his own peril*, and the question of whether he was justified in using the weapon is to be determined by you, unless there is no reasonable inference in the evidence except that the use of deadly weapon appeared necessary to protect himself or another from death or great bodily harm at the hands of his assailant.

(emphasis added).

¶21. This Court has condemned instructions that are contradictory and confusing. *Scott v. State*, 446 So. 2d 580, 583 (Miss. 1984). This Court, when dealing with a self-defense instruction, has stated that

> If a party has "an apprehension that his life is in danger" and believes "the grounds of his apprehension just and reasonable" a homicide committed by that party is in self-defense. These are the grounds upon which a claim of self-defense must be predicated. *Shinall v. State*, 199 So. 2d 251 (Miss. 1967); *Bond v. State*, 249 Miss. 352, 162 So. 2d 510 (1964). A party acting upon this principle does not "*act at his peril.*" Of course, it is for the jury to determine the reasonableness of the ground upon which the defendant acts but if the defendant's apprehension is reasonable, *there is no peril.*

*Id.* at 583-84 (emphasis added). "When a jury is given instructions which are *in hopeless conflict this Court is compelled to reverse* because it cannot be said that the jury verdict was founded on correct principles of law." *Id*. at 583 (citing *Pittman v. State*, 297 So. 2d 888

10

(Miss. 1974) (emphasis in original). Such contradictory instructions constitute reversible error and have been condemned by this Court. *Flowers v. State*, 473 So. 2d 164, 165 (Miss. 1985).

¶22. We conclude that jury instruction S-4 is contradictory and confusing and does not correctly state the applicable law because one acting in self-defense does not act at his own peril. This instruction constitutes reversible error. Therefore, this Court must reverse and remand for a new trial.

### 2. Hearsay Statement

¶23. As previously noted, Officer Russell testified that in the ambulance Davis told her that he was stabbed by Johnson. Johnson asserts that the circuit court erred in admitting Davis' hearsay statement under the dying declaration exception, M.R.E. 804(b)(2); *see Watts v. State*, 492 So. 2d 1281 (Miss. 1986). Johnson asserts that it was error to admit the statement into evidence under the dying declaration exception because there was no showing that Davis believed he was going to die. Furthermore, Johnson asserts that the admission of the statement deprived him of the right to a fair trial because it tainted the jury from the start and assured that he would be found guilty.

¶24. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right is affected by the ruling. Miss. R. Evid. 103(a). If the defendant fails to show what right, if any, was affected by such ruling, no reversible error lies. *Simmons v. State*, 805 So. 2d 452, 488, (Miss. 2001). This Court cannot reverse unless a substantial right has been affected. *Id.* at 488.

11

¶25. Johnson asserts that such statement deprived him of the right to a fair trial because it tainted the jury from the start and assured that he would be found guilty. However, the jury knew from the start of the trial that Johnson stabbed Davis. Johnson even admitted to stabbing Davis, and the only question for the jury was whether the stabbing was done in self-defense. The admission of Davis' statement did not affect a substantial right. Therefore, we need not address whether the statement was admissible to say that such statement affected Johnson's right to a fair trial since he, although in self-defense, admitted to stabbing Davis.

¶26. Johnson has failed to show what right, if any, was affected by the admission of the statement. This issue has no merit.

### 3. Weight and Sufficiency of the Evidence

¶27. Since we reverse and remand for a new trial because of prejudicial jury instructions, we decline to address Johnson's issue concerning the weight and sufficiency of the evidence.

### CONCLUSION

¶28. Jury Instruction S-3, the pre-arming instruction, was inappropriate under the facts of the case because it cut off the jury's consideration of self-defense. As was the case in *Keys*, the granting of this instruction was reversible error. Jury instruction S-4 is contradictory and confusing because one acting in self-defense does not act at his own peril. Since the granting of Jury Instructions S-3 and S-4 was reversible error, we reverse the circuit court's judgment and remand this case for a new trial consistent with this opinion.

¶29. **REVERSED AND REMANDED.**

**WALLER AND COBB, P.JJ., CARLSON AND DICKINSON, JJ., CONCUR. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. DIAZ, GRAVES AND RANDOLPH, JJ., NOT PARTICIPATING.**