## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

### NO. 2017-KA-00807-COA

**MICHAEL SORRELL A/K/A MICHAEL SORRELL JR.**         **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**         **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/08/2017 |
| TRIAL JUDGE: | HON. WILLIAM A. GOWAN JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 01/31/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WESTBROOKS, J., FOR THE COURT:**

¶1. Michael Sorrell appeals his conviction of one count of first-degree murder and one count of being a felon in possession of a firearm in the Hinds County Circuit Court. Sorrell raises three issues on appeal. After review of the record, we find that the circuit court erred in giving a pre-arming instruction and reverse and remand for a new trial.

### FACTS

¶2. On August 20, 2014, Sorrell shot and killed La'Cordne Green at the Arbor Park Apartments in Jackson, where Sorrell lived with his girlfriend, Robin Darnell. At trial,

Sorrell claimed he shot Green in self-defense. The jury was instructed on various theories including first-degree murder, second-degree murder, heat-of-passion manslaughter, self-defense, and the defense of necessity. Additionally, the jury was given a pre-arming instruction.

¶3. Sorrell was convicted of first-degree murder and possession of a firearm by a convicted felon. He was sentenced as a habitual offender under Mississippi Code Annotated section 99-19-81 (Rev. 2015) to life imprisonment on the murder conviction and ten years on the possession conviction, with the sentences to be served concurrently in the custody of the Mississippi Department of Corrections.

¶4. Sorrell subsequently moved for a judgment notwithstanding the verdict or, alternatively, a new trial, which the circuit court denied. Sorrell now appeals and argues that: (1) the circuit court erred in giving a pre-arming instruction, (2) the circuit court erred in denying his motion to suppress evidence, and (3) the State committed prosecutorial misconduct during its opening statements, or alternatively, he received ineffective assistance of counsel when his counsel failed to object.

¶5. We find that the circuit court committed reversible error in giving a pre-arming instruction and reverse and remand this case to circuit court for a new trial in accordance with this opinion.

## STANDARD OF REVIEW

¶6. "Jury instructions are generally within the discretion of the trial court, and the settled standard of review is abuse of discretion." *Boston v. State*, 234 So. 3d 1231, 1233 (¶7)

2

(Miss. 2017). "Jury instructions must fairly announce the law of the case and not create an injustice against the defendant." *Id.* "For example, in homicide cases, the jury should be instructed about a defendant's theories of defense, justification, or excuse that are supported by the evidence, no matter how meager or unlikely." *Id.* (internal quotation mark omitted).

## DISCUSSION

¶7.     Sorrell first asserts that the circuit court erred in giving Jury Instruction S-10. Jury Instruction S-10 instructed the jury as follows:

> The Court instructs the jury that if you find from the evidence that the defendant was the initial aggressor and provoked a difficulty, arming himself in advance, and intending, if necessary, to use his weapon to overcome his adversary, then the right of self-defense is forfeited.

¶8.     Sorrell asserts that Jury Instruction S-10 is a "pre-arming instruction" that "depriv[ed] [him] of his fundamental right to present a defense" and should not have been given since the evidence was conflicted as to whether he armed himself with the intention of initiating a confrontation with Green. We agree.

¶9.     The Mississippi Supreme Court has strongly denounced the use of the pre-arming instruction, even going as far as to warn the State that its use is done at the State's "own peril." *Boston*, 234 So. 3d at 1234 (¶10). This warning should be heeded, and this Court should discourage liberal use of the instruction.

¶10.     The facts in the present case are very similar to those in *Boston*. In *Boston*, the altercation arose when Kevin Boston went to his estranged wife's job to change a tire for her. *Id.* at 1232 (¶2). While there he encountered the victim, Willie Dean. *Id.* Dean worked as a contract worker at the same elementary school as Boston's wife, and the two had previously

3

had a romantic relationship. *Id.* at (¶3). The initiation and confrontation between Kevin and Dean was heavily disputed in the record. *Id.* at (¶4). Boston contended that he acted in self-defense while the State theorized that he attacked Dean. *Id.* Regardless, as a result of the encounter, Boston stabbed Dean with a pocket knife he had purchased a month before the incident. Boston maintained that Dean threatened him and attacked him with a pair of pliers on his wrist. *Id.* The State countered with pictures of Boston's wrist after the arrest, which showed no visible injuries. *Id.* at 1233 (¶4). Additionally, no pliers were recovered from the scene, and there was no direct evidence of the altercation or the stabbing other than Boston's testimony. *Id.* Furthermore, there was witness testimony that Boston approached Dean first and that Dean said the defendant "stabbed me for no reason." *Id.* at (¶5). At trial, the court gave a pre-arming instruction requested by the state, and on appeal, the Supreme Court reversed and remanded, condemning the use of the pre-emptory instruction. *Id.* at 1236 (¶15).

¶11.    Here, there was no direct evidence regarding the initiation of the shooting, only contradicting theories. Sorrell testified that he saw Green looking into the Black Impala he shared with his girlfriend Robin Darnell, and Sorrell consistently stated that he approached Green to determine why was he looking into his car. Sorrell's testimony evinced that he calmly approached Green without the intent of revenge as he maintained that Green shot at him first immediately upon him asking that question.

¶12.    Although no shell casings from Green's gun were recovered, a stolen Beretta pistol was found underneath Green's body, as well as gunshot residue on the back of Green's back

4

hand. There was no indication that Green was the person who shot into the apartment in July, no evidence that Sorrell purchased the gun intending to use it on Green, and no evidence of known hostility between the two. The Mississippi Supreme Court has held that "when there is ambiguity regrading who is the first aggressor, a pre-arming instruction is not appropriate." *Johnson v. State*, 908 So. 2d 758, 762 (¶15) (Miss. 2005) (citing *Barnes v. State*, 457 So. 2d 1347, 1349-50 (Miss. 1984)).

¶13. Since we reverse and remand for a new trial because of the pre-arming instructions, we decline to address Sorrell's claims regarding his motion to suppress and his assertion that the State committed prosecutorial misconduct in its opening statement.

## CONCLUSION

¶14. In considering the evidence before us and the fact that the Supreme Court has stated that "[w]e have consistently, painstakingly, and repeatedly cautioned and admonished bench and bar that [pre-arming] instructions . . . should be given only in the exceedingly rare circumstances where the facts meet all the required elements necessary to preempt a defendant's right to claim self defense,"[1] we reverse and remand for a new trial.

¶15. **REVERSED AND REMANDED.**

**BARNES AND CARLTON, P.JJ., GREENLEE, TINDELL, McDONALD AND McCARTY, JJ., CONCUR. LAWRENCE, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, P.J., GREENLEE, TINDELL, McDONALD AND McCARTY, JJ. GRIFFIS, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WILSON, J.**

**LAWRENCE, J., SPECIALLY CONCURRING:**

---

[1] *Thompson v. State*, 602 So. 2d 1185, 1189 (Miss. 1992).

¶16. I concur with the majority. I write separately to express disdain for use of pre-arming instructions; their use should be limited in clearly warranted situations due to their potential to allow misguided evaluation of evidence of self-defense by juries.

¶17. At trial, Sorrell claimed he acted in self-defense and only shot the victim after the victim shot at him first. There was evidence presented at trial that arguably supported his theory of self-defense. A witness testified that someone shot at the apartment where Sorrell had exited during the incident (leaving a bullet hole), a gun was found under the victim, and gunshot residue was found on the back of the victim's right hand. Nevertheless, the jury could have easily concluded that Sorrell could not avail himself of the defense of self-defense when the State asked for and received a pre-arming instruction. The State's intention in obtaining a pre-arming instruction validates the concerns with these types of instructions. The following exchange occurred on the record:

> THE COURT: It might -- it would be under castle doctrine. The real issue is here, can he claim castle doctrine as a - since he's having to claim defense of necessity. You know, he's got 911 on his telephone. He's got the right to stay in that apartment and not put himself at risk by going out to talk -- to look at his car.
>
> DEFENSE: But, Your Honor, that constructively says he has a duty to retreat before anything ever happens. He has no duty to retreat and he certainly has a right to protect his property. Even convicted felons have a right to protect their property.
>
> THE COURT: Well, see, I guess that's where the real deal is. What's the reasonable alternative to going out -- you know, fit that into those three -- into those three requirements.
>
> . . . .
>
> STATE: *I'm not asking for a necessity instruction, Your Honor. I'm asking*

6

*for an instruction that tells the jury that he can't argue self-defense if he brought the gun and he was the initial aggressor with the intent to create the drama. The State's asking for that instruction based on this case.*

(Emphasis added).

¶18. The State's comments indicate its intent of having the pre-arming instruction do exactly what our supreme court has condemned—that is, prevent a defendant access to the defense of self-defense even if sufficient facts are present warranting the grant of the self-defense instruction. In fact, that is exactly what happened. The jury was instructed on self-defense and pre-arming. The pre-arming instruction given to the jury read as follows:

The Court instructs the jury that if you find from the evidence that the *defendant was the initial aggressor and provoked a difficulty*, arming himself in advance, and intending, if necessary, to use his weapon to overcome his adversary, then the right of self-defense is forfeited.

(Emphasis added).

¶19. When evidence shows that a person walks out of *his* home, goes to *his* car to investigate suspicious activity concerning *his* property, it is hard to imagine those facts as "provok[ing] a difficulty." By granting both the self-defense instruction and the pre-arming instruction, the court, with one hand, gave the jury the responsibility of deciding self-defense, but took it away with the other hand by telling the jury self-defense could be "forfeited." Thus, the granting of the pre-arming instruction potentially caused the jury to ignore the self-defense evidence entirely.

¶20. If the pre-arming instruction had not been given and the jury convicted Sorrell after considering and weighing the self-defense evidence, I would find no error in the trial's process. My concern lies with the fact that the law given to the jury not only has been

7

condemned but also potentially prevented Sorrell from having his evidence of self-defense weighed by the jury.

¶21.   The circuit court found sufficient evidence existed to warrant a self-defense instruction yet essentially and effectively precluded its consideration by the jury in giving the pre-arming instruction.  For these reasons, I concur with the reversal of Sorrell's conviction and agree the matter should be remanded for a new trial.

**BARNES, P.J., GREENLEE, TINDELL, McDONALD AND McCARTY, JJ., JOIN THIS OPINION.**

**GRIFFIS, C.J., DISSENTING:**

¶22.   Because I find no abuse of discretion by the circuit court in giving Jury Instruction S-10, I respectfully dissent.

¶23.   "[A] pre-arming instruction is a peremptory instruction[2] for the prosecution, impairing or precluding the defendant's right to self-defense." *Boston v. State*, 234 So. 3d 1231, 1234 (¶9) (Miss. 2017) (internal quotation mark omitted).  The supreme court has strongly condemned the use of a pre-arming instruction because such an instruction "precludes a defendant from asserting a claim of self-defense" and "cut[s] off the jury's consideration of self-defense."  *Id*. at (¶10).  A pre-arming instruction is only appropriate where "[t]he record [is] uncontradicted that the defendant[] armed [himself] with the intent to initiate a confrontation."  *Id*. at 1235 (¶12).  "[W]hen there is ambiguity regarding who is the first aggressor, a pre-arming instruction is not appropriate." *Johnson v. State*, 908 So. 2d

---

[2] We note that Jury Instruction S-10 was not "peremptory" in nature.  The instruction was a correct statement of the law and advised the jury what the law was "if" they found certain facts "from the evidence."

758, 762 (¶15) (Miss. 2005).

¶24. Sorrell claims Jury Instruction S-10 should not have been given since "the evidence conflicted (i.e. was not uncontradicted) as to whether [he] armed himself with the intention of initiating a confrontation with Green." I disagree.

¶25. At trial, Sorrell testified in his own defense. Specifically, Sorrell testified as follows:

> Defense Counsel: Okay. Now what were you doing on that evening?
>
> Sorrel: Okay. I was sitting in the living room playing a game. I heard a loud car pull up. When I looked outside, at the time, the car was still on just sitting there. So, just by me being on high alert, I watched - I watched him. You know, I cut - I cut my lights off and I watched him.
>
> At first when he got out of the car, look like he was talking to hisself, as far as like he was talking to hisself like he was angry at someone. So, I'm steady watching. I'm steady watching. He went back to his car, and he left the door open. When he left the door open, that had in my mind like, "okay[,] [h]e going somewhere else."
>
> While watching him, that's when he went between my car and his car, and he looked inside my car. Once he looked inside my car, that triggered my mind, like, "I don't know what was going on with him," you know. By that time - I don't know him. I got $1,200 worth of speakers in my car. So at that time, I'm trying to protect the car.
>
> He walked back to his car. By the time he walked back to his car and got in his car, he still had his door open. So by that time, I went outside. By the time I approached him, he was closing his door and walking away. By that time, he was behind my car. And I asked him, I said, "What are looking in my car for?" And next thing you know, I just saw a flash. He shot at me.
>
> And once he shot at me, I don't know how - I don't know

9

how I ain't get shot.  But I just saw a flash.  He ducked around the truck, I ducked behind the truck, and we both met up on the left side.  And that's when I shot two times, boom, boom.  And I took off running, he took off running.  And it just happened so fast.

¶26.   When asked why he was on "high alert," Sorrell explained that about two and half weeks before the incident, his house was "shot up."  Sorrell stated he was "paranoid" and had "a family in the house [he] [had] to protect."

¶27.   Sorrell further testified:

Defense Counsel:   Okay.  Now, at the time you looked out the window, what did you see the individual in the car do and how did he act and what direction did he go?

Sorrell:   Okay.  When he first go out.  Like I said, he left the door open.  He walked around in this area right here in the middle.

Defense Counsel:   Okay.  And when he left the door open, was his car still running?

Sorrell:   Yes, at the time, his car was still running.

Defense Counsel:   Okay.  And at that time, what did you do?

Sorrell:   When I seen him right there?

Defense Counsel:   Yes.

Sorrell:   That's when I had just started to just get my things together and walk outside.  I walked outside.

¶28.   When asked whether he had to come out of his house with a gun, Sorrell responded:

Of course.  I didn't know because - this is why I came out of the house with a gun, because that's the same orange car I seen when my house got shot up.  Of course if a car that you see in a shootout that shot your house up, they park beside you car, you're going to wonder why.  You're going to go out there and

10

protect it.

¶29. During trial, Sorrell argued that he "believed" Green was "breaking into his car, which would be the initial aggression." Yet, there was no evidence that Green was breaking into Sorrell's car. Instead, according to Sorrell, Green simply "looked inside [his] car," which "triggered [Sorrell's] mind" that Green intended to break in and steal $1,200 worth of speakers. As a result, Sorrell, who was admittedly "paranoid," armed himself with a gun and proceeded outside to confront Green in order "to protect the car" and his family.

¶30. Additionally, Keeunta Cotton testified that on the day of the shooting, he had conversed with Sorrell, who wanted to know if Green had any money. After the shooting, Sorrell called Cotton and stated that "the man went down" and "didn't get back up." Moreover, Sorrell asked Cotton "to come outside and pick up bullet shells and a hat."

¶31. Like Sorrell, the majority asserts it was an abuse of discretion to give the pre-arming instruction and cites and relies on *Boston*. In *Boston*, the court noted three cases wherein a pre-arming instruction was given and affirmed on appeal: *Hart v. State*, 637 So. 2d 1329 (Miss. 1994); *Hall v. State*, 420 So. 2d 1381 (Miss. 1982); and *Reid v. State*, 301 So. 2d 561 (Miss. 1974). *Boston*, 234 So. 3d at 1235 (¶12).

¶32. In *Hart*, the defendant testified that he armed himself and went to the victim's house because it was his only chance to settle a dispute between the parties. *Hart*, 637 So. 2d at 1334. The supreme court found that "the proof [wa]s uncontradicted that, while in no physical danger from [the victim], [the defendant] armed himself in advance with the intent of provoking or bringing on a difficulty and shooting [the victim]. . . ." *Id*. at 1337.

11

¶33.     In *Hall*, the defendant's own testimony showed that he armed himself and deliberately drove to the victim's house to engage in a confrontation. *Hall*, 420 So. 2d at 1384-85. Additionally, in *Reid*, the defendant testified that he deliberately armed himself with a pistol, drove to a trailer where the victim was located, and immediately challenged the victim. *Reid*, 301 So. 2d at 564.

¶34.     In *Boston*, the only evidence concerning a weapon was that the defendant purchased a knife about a month before the incident and was carrying the knife in his pocket. *Boston*, 234 So. 3d at 1235 (¶14). No evidence existed that the defendant placed the knife in his pocket with the intent to provoke an altercation with the victim. *Id*. Thus, the court found that unlike *Hart*, *Hall*, and *Reid*, there was no evidentiary support for the granting of a pre-arming instruction. *Id*. at 1236 (¶15).

¶35.     Although I agree with the majority that the liberal use of a pre-arming instruction should be discouraged, I find this case is factually distinguishable from *Boston*. As previously noted, Sorrell was inside his apartment when he saw Green outside in the parking lot looking into his car. Instead of calling the police to report Green, Sorrell armed himself with a gun and voluntarily proceeded outside to confront the man who he believed was breaking into his car. When asked if it was necessary for him to come out of his house with a gun, Sorrel responded, "[o]f course . . . that's the same orange car I seen when my house got shot up . . . [y]ou're going to go out there and protect it."

¶36.     Here, as in *Hart*, "the proof was uncontradicted that, while in no physical danger from [Green], [Sorrell] armed himself in advance with the intent of provoking or bringing on a

12

difficulty" with Green. *Hart*, 637 So. 2d at 1337. Additionally, similar to the facts in *Hall* and *Reid*, Sorrell testified that he deliberately armed himself and went outside to where Green was located in order to "protect [his] car."

¶37. I find the "record [i]s uncontradicted that [Sorrell] armed [himself] with the intent to initiate a confrontation." *Boston*, 234 So. 3d at 1235 (¶12). Accordingly, I do not believe the circuit court abused its discretion in giving Jury Instruction S-10 and would affirm.

**WILSON, J., JOINS THIS OPINION.**